CHRISTOPHER G. PEARCE AND OTHERS, INCORPORATED AND ACTING UNDER THE NAME OF THE NILES WORKS, APPELLANTS, *v.* JESSE W. PAGE AND OTHERS, CLAIMANTS OF THE STEAMBOAT DOCTOR ROBERTSON.

In a collision which took place in the Ohio river between a steamboat ascending and a flat-boat descending, the steamboat was in fault.

When a floating boat follows the course of the current, the steamer must judge of its course, so as to avoid it. This may be done by a proper exercise of skill, which the steamer is bound to use.

Any attempt to give a direction to the floating mass on the river would be likely to embarrass the steamer, and subject it to greater hazards. A few strokes of an engine will be sufficient to avoid any float upon the river which is moved only by the current, and this is the established rule of navigation.

THIS was an appeal from the Circuit Court of the United States for the district of Kentucky, sitting in admiralty.

It was a libel filed in the District Court of Kentucky by Pearce and others against the steamboat Doctor Robertson,

for the loss of certain castings, which the libellants had ship ped on board of a flat-boat, sunk by collision with the steam- boat on the Ohio river.

The District Court dismissed the libel, as not being sus- tained by the proofs.

This decree was affirmed by the Circuit Court, and the libellants appealed to this court.

It was argued by *Mr. Lincoln* for the appellants, and by *Mr. Phillips* upon a brief filed by himself and *Mr. Nicholson* for the appellees.

The arguments would be difficult to be explained without diagrams and a full report of the testimony.

Mr. Justice McLEAN delivered the opinion of the court.

This is a libel filed by Christopher G. Pearce et al., incorpo- rated and acting under the name of "Niles Works," and by virtue of the statute of the State of Ohio, passed May 1, 1852, entitled "An act to provide for the creation and regulation of incorporated companies in the State of Ohio," against the steamboat Doctor Robertson, her tackle, apparel, engine, and furniture, and all persons intervening for their interest in the same, in a cause of collision, civil and maritime.

The libellants were the owners of a large amount of iron castings, made for and intended as sugar-mill machinery, which was at the time of the said collision in a flat-boat, well manned and equipped, and which was being navigated on the Ohio river, and in the usual mode of navigating such craft, and near the Illinois shore, and along the side of the Cincin- nati tow-head, about twenty-five feet therefrom, and had crossed over from the Kentucky-side, and was at the time in full view of the Doctor Robertson and her pilot.

The libel states that on the eighth day of August, 1856. at about eight o'clock in the forenoon of that day, and while the said flat-boat was being navigated as aforesaid, the said steamboat, Doctor Robertson, approached her, coming up the river, and having a lighter in tow, with full speed; and although the flat-

boat was in full view of her pilot, and there was ample room for the said steamboat to pass to the left of, and between her and the Cincinnati bar, which lay between the flat-boat and the Illinois shore, yet the said steamboat endeavored to run between the said flat-boat and the said tow-head, and ran herself and the said lighter with great force directly into and upon the said flat-boat, and broke in the sides thereof, and caused the flat-boat immediately to sink in about twenty feet of water, and so injured it as to render it entirely useless.

It happens in this case, as in all other cases of collision, that the witnesses on the respective boats are somewhat contradictory in their statements. It is admitted, that in ascending the Ohio river, some fifty or sixty miles below Cincinnati, the steamboat Doctor Robertson, a stern-wheel boat, of fifty tons burden, in passing up the river, near the place called the Cincinnati tow-head, while running close to the Kentucky shore, being from one to two miles below, in full view of the defendants' flat-boat, which was freighted with sugar-mills, and other machinery, for the Western trade; and that the flat-boat, being put in the course of the current, floated down the river, her stern and front oars not in use, but laid on the boat, without any effort by the hands on the flat-boat, continued to float with the current, until it came into collision with the ascending steamboat. That this boat, to avoid a snag that projected some distance into the river, changed her course, by which means she came into collision with the flat-boat, which was immediately sunk in water near fifteen feet deep.

There seems to have been little or no effort made to avoid this collision by those who had the command of the flat-boat. There were two other flat-boats lashed together, which followed the first boat at a distance of some two or three hundred yards; and they, perceiving that a collision was likely to occur, used their oars, so as to avoid the ascending steamboat. Under this state of facts, the question of fault arises.

The defendants' flat-boat was ninety-six feet in length, and some ——— feet in breadth, with an oar or sweep in the front and rear parts of the boat, so that some direction might be given to it. But this movement cannot be relied on when

the colliding boats are near to each other.    The flat-boat was heavily laden, and occupied near a hundred feet in a somewhat rapid current, and the only means of removing it out of the direction of the steamboat was, by working the end oars across the current.    This could not be done successfully, unless the boats were so far apart, as by a diagonal movement to secure the aid of the current in escaping a collision.

But what is the law of the river on this subject, in regard to floating flat-boats and steam vessels?    The self-moving power must take the responsible action.    This cannot always be done, even with a fair wind, by a sailing vessel, as it may suddenly change, or be subject to accident.    But steam is generally under the control of the will of the engineer, and he is responsible for a proper use of it.

Schyler C. Barnet says he was passenger on the Doctor Robertson, and that five or six miles below Shawneetown she came in collision with a flat-boat, loaded with sugar-mill ma chinery, at about nine or ten o'clock of a clear morning; the flat-boat had come over the reef, and had straightened down the river, and was about one hundred feet from the tow-head, the witness sitting half an hour on the boiler-deck of the steamer before the collision, the steamer running about fifty feet from the Kentucky shore, on the larboard side; she had a lighter in tow, and when she approached very near the flat-boat she turned out a little from the shore to avoid a snag just above her, but kept on until the lighter struck the flat-boat, when the bow of the steamer was some fifty or sixty feet below the tow-head; the lighter struck the flat-boat, and ran half-way over it, which caused the flat-boat to sink.

And the witness says, that on the part of the flat-boat nothing could have been done, as she was lying in the best possible position.    Since 1824, the witness states, he has been boating on the river, and that the general custom has been, and now is, "for steamboats to give the way for flat-boats to pass."

Alexander Ford has been on the river ten or twelve years, and a pilot for three years.    The flat-boat was lying nearly straight with the tow-head, about one hundred and fifty yards.

more or less, above the foot of it, and about twenty-five or thirty yards from the Kentucky shore. The Doctor Robertson aimed to go on the starboard side of the flat-boat, when the barge which the Robertson had in tow struck the flat-boat, and sunk her. He thinks the Robertson had stopped her engine, which, if it had been done in time, the boats would not have come together. He says there was plenty of room to pass outside of the flat-boat. The witness says "that he supposed the Robertson could pass on either side of the flat-boat. The flat-boat was not easily turned out of line. The boats in approaching each other were in full view a mile and a half. It is customary for a steamboat to give way to a flat-boat. The steamboat takes either side of the descending flat-boat, so as to avoid it. Ford's boat was from seventy-five to one hundred and twenty-five yards above the machinery boat when he perceived that the steamboat would run into the flat-boat."

The witnesses generally concurred in saying, that the steamboat could have run to the Kentucky shore until the flat-boat had passed, or could have run on the Illinois side of the flat-boat. In the language of John Walker, a witness, "the steamboat could have either gone to the shore or run closer to the shore, or she might have gone entirely outside of the flat-boat; and he does not think those persons on the flat-boat could have done anything to have prevented the collision." Witness thinks there was one hundred to one hundred and fifty yards of river on the Illinois side.

William P. Lameth, for the last fifteen years, has acted as steamboat captain, and he says, "it is the usual custom for steamboats to examine the position of the flat-boats, and to take the best possible course to avoid them, on either side that seems best. If danger is apprehended, it is usual to ring a slow bell, and run easy. If danger be apparent, the boat should land or stop entirely, and let the flat-boat pass."

John F. Farrell says, "it is the duty of a flat-boat to straighten itself in the river, ease its oars, and pursue the course with the current, and the steamboat must avoid her." The snag in the river, Douglass says, was one hundred feet above the bow of the steamer when the boats struck. The

two other flat-boats were, when the steamer struck the flat-boat, one hundred and fifty yards above the colliding boats, and the witness, Douglass, thinks the steamboat could have passed, if all the flat-boats had kept their places. The stern of the flat-boat was sixteen feet under water.

Several witnesses called by the steamer seem to think that the flat-boat was bound to avoid the steamer; but such a rule would be unreasonable, and would increase the risk of navigation. When a floating boat follows the course of the current, the steamer must judge of its course, so as to avoid it. This may be done by a proper exercise of skill, which the steamer is bound to use. Any attempt to give a direction to the floating mass on the river would be likely to embarrass the steamer, and subject it to greater hazards. A few strokes of an engine will be sufficient to avoid any float upon the river which is moved only by the current; and this, I understand, is the established rule of navigation.

We think the steamer was in fault in not avoiding the flat-boat, on which ground the judgment of the Circuit Court is reversed.